UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

_____
                                        )
DR. JEFFREY ISAACS                      )
                    Plaintiff,          )
                                        )
vs.                                     ) Case No.
                                        )
TRUSTEES OF DARTMOUTH COLLEGE,          )
NH BOARD OF MEDICINE,                   )
DARTMOUTH HITCHCOCK MEDICAL CENTER,     )
                                        )
                    Defendants.         )
_____)

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

### I.  INTRODUCTION

1.    Plaintiff, Jeffrey Isaacs, M.D. ("Dr. Isaacs") brings this civil rights action to remedy the repeated efforts and activities of the New Hampshire Board of Medicine (the "Board"), Dartmouth Hitchcock Medical Center( "Hitchcock"), and the Trustees of Dartmouth College ("Dartmouth," collectively, "Defendants") to effectively deprive him of his ability to pursue his chosen career of practicing medicine.   Defendants' conduct relating to and treatment of Dr. Isaacs constitute violations of his constitutional rights warranting an award of damages and entry of injunctive relief.

2.    Rather than take advantage of Dr. Isaacs' skills and learning, his supervisors repeatedly subjected him to improper abuse and, when that understandably led Dr. Isaacs to begin to suffer from a serious medical condition, Dartmouth officials failed to let him take leave, preferring to carry on with their elaborate plans to end his medical career. To this extent,

Dartmouth destroyed emails, destroyed medical device data, and created false entries in his personnel record.

3.    To date, no investigations ever took place at Dartmouth, let alone fair hearings or other due process requirements such as academic probation. Without any such evidence, Dartmouth advanced absurd defenses that "automatic processes" destroyed Isaacs' hospital email account and medical devices. This repeated lack of due process ultimately stems from Dartmouth's refusal to name a source who revealed, against Federal Educational Records laws, a decade old sealed disciplinary record from California.

4.    The Board added to Dr. Isaacs' injuries in reprimanding him based upon incorrect information from the unknown source.  Dr. Isaacs has suffered five years of disability as a result of these malicious actions.

## II.  JURISDICTION AND VENUE

5.    Venue in this District is proper in that the Defendant transacts business here and the conduct complained of occurred here in the District of New Hampshire.

6.    Jurisdiction in this Court arises under 28 U.S.C. s. 1331.

## III. PARTIES

7.    Plaintiff Dr. Jeffrey Isaacs has a mailing address of: 3553 West Chester Pike, Unit #177, Newton Square, PA 19073. Dr. Isaacs holds an A.B. from Dartmouth College, an MBA from Wharton/Insead, and an M.D. from the American University of the Caribbean.  He began his residency at Dartmouth in June 2011, and his superiors terminated him in March 2012.

8.    Defendant New Hampshire Board of Medicine is located at 121 South Fruit Street, Suite 301, Concord, NH 03301-2412.  The Board's mission, according to its website, is to

"protect the public from the unprofessional, incompetent, or impaired practice of medicine."  The Board maintains a database on its website of past Board actions, which includes links to Board decisions.  The Executive Director of the Board of Medicine is Peter Danles.

9. Defendant Dartmouth Hitchcock Medical Center is a non-profit corporation with a principal address of One Medical Center Drive, Lebanon, NH 03756. Defendant Dartmouth Hitchcock Medical Center does not have a registered agent in the State of New Hampshire. Plaintiff was a salaried employee of Mary Hitchcock Memorial Hospital, related to DHMC, but was a trainee of Dartmouth Psychiatry (see below).

10. Defendant Trustees of Dartmouth College has a principal office address at 63 South Main Street, Ste. 301, Hanover, NH 03755 and no registered agent.  According to its webpage, the Board of Trustees "has ultimate responsibility for the financial, administrative and academic affairs of [Dartmouth] College.' The College disowned the Psychiatry department in August of 2016; at the time of the alleged events, Plaintiff was in a training program administered by faculty employed by the College.

## IV. FACTUAL ALLEGATIONS

### INTRODUCTORY FACTS

11. Jeffrey Isaacs was a successful student physician through his four years of medical school.

12. He was well integrated socially and was academically flourishing.

13. His medical training included clerkship training at St George's University London, Cleveland Clinic and Mt Sinai School of Medicine (NY). Dr. Isaacs received strong

reviews, mostly honors, from supervising professors at more than twelve different clerkships at the aforementioned institutions.

14. Dr. Isaacs thrived as a medical student, he was well respected and academically successful.

15. Dr. Isaacs received his medical degree in 2010 after he placed in the top decile on the highly competitive United States Medical Licensure Exam Step 1.

16. Dr. Isaacs sent his formal employment application to Dartmouth Medical School in March of 2011. A copy of that application can be found attached to this complaint at Exhibit A.[1]

17. Dr. Marc L. Bertrand was the Director of Graduate Medical Education at Dartmouth. Dr. Christine T. Finn was the Program Director for the Adult Psychiatry training program. A review of that exhibit indicates that Dr. Bertrand and Dr. Finn signed that document.

18. Their signature on that document indicates that they both received the document.

19. That document indicates that Dr. Isaacs briefly attended a training program at the University of Arizona (hereinafter "Arizona").

20. Given that Dr. Bertrand had undergone training at the University of Arizona it is reasonably expected that he noticed Isaacs had attended that school, on an application Bertrand had a duty to review.

## TIME AT DARTMOUTH

21. Upon his arrival at Dartmouth, Plaintiff was placed under the supervision of Dr. Simon Khagi.

22. On the Plaintiff's second day of work it was requested that he do a digital rectal prostate examination ("DRE") on a patient with terminal metastatic cancer.

---

[1] All Exhibits are filed conventionally under Seal along with a Motion to Seal in accordance with L.R. 83.12(c).

23. He was required to do a second unnecessary DRE examination on another patient shortly thereafter.

24. Dr. Isaacs, following the orders of his superior, performed these prostate exams.

25. Dr. Isaacs medical situation deteriorated after several days under Khagi's supervision.

26. Dr. Isaacs for the first time suffered from an onset of medical symptoms including heart issues, nightmares, sleep disturbances and an inability to stay awake for extended periods of time.

27. Khagi would later tell Isaacs that the unnecessary DRE assaults were "an opportunity to learn twice." (See Exhibit B).

28. Medical schools have strict, well established protocols for non-medically indicated exams of a sensitive nature.

29. These protocols typically involve volunteer, standardized patients.

30. In any case, patient subjects must consent to undertake teaching exams.

31. Isaacs was never told at the time of examination that the exams were, in Khagi's opinion, only necessary for teaching, as opposed to being medically indicated.

32. It would be highly unusual to conduct a teaching prostate exam on a patient suffering final stages of terminal, metastatic cancer.

33. Said patient's metastatic cancer did not originate as prostate cancer, making the request even more unusual and unethical.

34.  Khagi's assertion that the exams were meant for teaching purposes is implausible.

35. Dr. Isaacs requested that Dartmouth investigate this incident as a sexual assault; to date no investigation ever occurred.

36. On Sunday April 20, 2014 at 12:52 am Dr. Isaacs sent a written request to President Philip Hanlon which requested an investigation into these issues. (See Exhibit C).

37. Despite several requests no investigation ever occurred.

38. During the time where Dr. Isaacs was working with Dr. Khagi a derogatory email was going around the internal medicine department. (See Exhibit D).

39. In that email Jessica Fischer indicated that she felt really bad for Dr. Isaacs and stated "I can't imagine that working with Krawitt and Simon (Khagi) was the best situation for someone who's already a little fragile."

40. The response to that email by Dr. Friedman was "you need to 'experience' this guy before you feel bad for him. He is not helping the situation."

41. Throughout his six months as an intern Dr. Isaacs was receiving superior reviews from a number of Doctors, including Dr. Donald West, with whom he spent the majority of his time training in the addiction medicine subunit.

42. Despite these positive reviews, Dr. Finn insisted on creating a Performance Improvement Plan ("PIP") for Dr. Isaacs.

43. A PIP is not formal probation. Probation is an accreditation requirement for struggling residents.

44. This PIP plan contained exaggerated and fictitious items.

45. For example the Performance Improvement Plan included a page long complaint from co-worker Natalie Riblet.

46. When shown a PIP entry about an alleged complaint Riblet had of Isaacs, Dr. Riblet was surprised to see this fictitious complaint and exclaimed "I do not recall this episode at all" (See Exhibit E)

47. In early September 2011 Plaintiff met with Christine Finn to request a medical leave of absence.

48. Plaintiff's leave was denied and the Plaintiff was told by Doctor Finn that his performance was satisfactory.

49. On October 12, 2011 Dr. Isaacs completed an actigraph study; the results of this study were that Dr. Isaacs suffered with serious sleep issues.

50. Upon information and belief, the results of this study were improperly destroyed, but they would have indicated that Dr. Isaacs was impaired and needed medical leave.

51. During Thanksgiving Dr. Simon verbally confirmed what Dr. Isaacs was already starting to think when he told him "you're right, they're building a case against you to fire you."

52. Several days later in a meeting with Christine Finn, Plaintiff again requested medical leave or accommodations. These requests were denied.

53. Christine Finn indicated to the Plaintiff that "accommodations are difficult to arrange for an intern."

54. The falsehoods against Dr. Isaacs came to a head during a January 13, 2012 meeting between Plaintiff, Christine Finn and residency co-chair Dr. Green.

55. During that meeting, the two asked the Plaintiff to resign, to avoid the ramifications of vaguely threatened further investigations.

56. During that meeting, the two indicated that the Plaintiff had not disclosed important items on his application.

57. They were vaguely referring to both Arizona and Keck School of Medicine.

58. This was an obvious falsehood as Christine Finn had signed the Plaintiff's application where he disclosed that he had attended Arizona.

59. Reflecting back to this meeting during a June 2012 New Hampshire unemployment hearing concerning Isaacs termination, Dr. Finn testified that "although we had been more than willing to work with Jeff around performance issues. The issues of fraud and misrepresentation were those that we did not feel like we could tackle effectively in the training program and the decision, you know, was made that he could not return." (See Exhibit F).

60. As such, Finn testified under oath that Isaacs' alleged performance issues did not warrant termination from residency.

61. She further indicated that the termination was a result of Dr. Isaacs not disclosing his dismissal from USC on his ERAS form. (See Exhibit G).

62. This testimony directly conflicts with testimony Dr. Finn gave under oath where she stated: "In terms of timing, I was not aware of the Arizona residency training until we sat down at the meeting in January, that week in January where we made the decision to place you on administrative leave. And I was not aware of the USC Medical School issue until sometime several weeks after that." (See Exhibit H).

63. Despite the conflicting stories of what was known by Dr. Finn at this point, the meeting ended with Dr. Finn stating that she would consider what process to pursue, including possible Administrative Leave.

64. After that meeting the Plaintiff developed wheezing and an acute-on-chronic stress reaction.

65. The Plaintiff was admitted to the Dartmouth Hitchcock Medical Center Emergency Room.

66. The Plaintiff relocated to Pennsylvania on sick leave.

67.  No written notice of Administrative Leave was ever issued.

68. Specifically, Dr.Isaacs was never placed on probation. He was never placed on Administrative Leave. He was never afforded a Fair Hearing.

69. All three of these processes are described and required under hospital bylaws, ACGME accreditation policies, and/or other DHMC contracts.

70. In the following weeks Dr. Isaacs requested and re-requested that he be granted a hearing to determine his status at Dartmouth.

71. No response to these requests was ever given.

72. The Plaintiff never received a hearing and was never able to present any evidence in his defense.

## AFTER DARTMOUTH

73. The Plaintiff, upon leaving Dartmouth, informed Dartmouth that there would be a suit filed and that all evidence should be preserved. (See Exhibit I).

74. Plaintiff made this request through email letter to College President Jim Yong Kim on January 15th notifying him of his claims that Dartmouth's Business Ethics guidelines had been violated. The email specifically invoked FRCP 34.

75. The college had a duty to preserve relevant evidence, and was noticed of this duty no later than January 15th.

76. Despite that notice the Plaintiff's computer and email accounts with Dartmouth Hitchcock Medical Center were disabled on January 17th and scheduled for deletion.

77. Isaacs noticed his account login was disabled and telephoned DHMC IT support on or around January 17th.

78. IT support told Isaacs that his supervisors ordered the deletion of his electronic accounts.

79. IT support further informed Isaacs that automatic safety mechanisms were preventing the deletion for approximately another week.

80. Isaacs desperately emailed Finn, Jim Yong Kim, and others pleading to reverse their order destroying his electronic login and email access.

81. Finn was aware of Isaacs Rule 34 request to Jim Yong Kim, at the time she ordered deletion of Isaacs electronic (e-DH) files.

82. Finn had referenced the litigation and complaints to Jim Yong Kim, in emails she sent to others in her department on or around January 17th.

83. Finn and Jim Yong Kim purposefully and intentionally ignored Isaacs pleas not to delete his eDH accounts.

84. Normally, an eDH account would only be deleted after an employee is properly terminated through due process including a fair hearing.

85. The destruction of Isaacs' eDH accounts constituted a felony under United States Code. 18 U.S.C 1519.

86. Dartmouth, via its attorneys, would later argue to the Court that automatic processes caused the destruction of Isaacs eDH accounts.

87. Dartmouth knew that the felony code has exemptions for ESI deletions caused by automatic processes.

88. As stated, in fact the only relevant automatic processes in this case were safety mechanisms to prevent the deletion of the ESI.

89. No automatic process caused the deletion of Isaacs' eDH ESI.

90. Finn & Jim Yong Kim's decision to delete Isaacs' eDH files caused the deletion.

91. Dartmouth, via statements made by their attorneys, defrauded this Court by suggesting automatic processes were to blame.

92. The deletion of Dr. Isaacs' electronic accounts severely limited his ability to support his well-founded claims in this Court and in administrative proceedings.

93. On February 6th Plaintiff again notified Dr. Jim Yong Kim of his claims that Dartmouth's Business Ethics guidelines had been violated. (See Exhibit J).

94. On March 16th the Office of Civil Rights notified Defendant Dartmouth of a pending HIPAA investigation.

95. On March 19th Defendants terminated Plaintiff's employment.

96. The termination letter for the first time indicated that the Plaintiff had been on formal Administrative Leave. (See Exhibit K). Plaintiff had not understood his leave to be formal and had received no notice that he was on leave previously. Plaintiff requested a fair hearing to discuss his termination.

97. No hearing was ever given.

98. In late 2013, Attorney Ed Kaplan , Hitchcock's litigation attorney at firm Sulloway & Hollis, sent Dr. Isaacs an email informing that he did not have a right to hearing regarding his termination, and Attorney Kaplan continued to take that position well into 2014.

99. Plaintiff was terminated without probation, administrative leave, or a Fair Hearing as would normally be required.

100.      Plaintiff, ill with the stress resulting from Dartmouth's actions filed a disability claim in early 2012.

101.     The American Association of Medical Colleges (AAMC) is the authority that manages the nationwide residency application process, ERAS (Electronic Residency Application Service). AAMC has an investigation unit for application problems, and it investigated Isaacs' application relating to the disclosure issue regarding his time at Keck.   At the conclusion of its investigation, AAMC determined that the disciplinary records had been sealed, and therefore, that Dr. Isaacs did not need to disclose them on ERAS.  (See Exhibit L). In January 2014, Finn testified under oath to accept the AAMC determination as a 'competent authority.' (See Exhibit M) Yet, Dr. Finn has never retracted the termination of Dr. Isaacs nor the reasons for it that are inconsistent with the AAMC determination, and which resulted in an erroneous life altering loss at the NH Board of Medicine.

### DARTMOUTH DUE PROCESS FAILURES

102.     The Defendants have violated the Plaintiff's right to due process in a continuous manner since his time at Dartmouth.

103.     Dr. Isaacs repeatedly requested an investigation into the circumstances of his residency and termination, as well as a fair hearing.  Neither Dartmouth nor Hitchcock performed an investigation or convened a hearing.  Dartmouth officials and Hitchcock physicians confirmed this dereliction in sworn testimony. No College investigation ever occurred into his claims of felony assault and evidence destruction.

104.     Counsel Kevin O'Leary swore that no Ethics Investigation ever was conducted, as Isaacs requested. (See Exhibit N).

105.     When asked "Did anyone investigate this matter at DHMC or Dartmouth College that you're aware of? This entire lawsuit was it subject to any investigation of your actions?" Dr. Finn responded "No." (See Exhibit O).

106.     Even after the Plaintiff had filed a federal lawsuit outlining the actions of Dr. Finn regarding his employment, no internal investigation of these events ever occurred.

107.     The Plaintiff inquired of Dr. Friedman "So to the best of your knowledge, you have no knowledge of an investigation regarding my allegation of felonious sexual assault that happened on M2?" Dr. Friedman responded "To the best of my knowledge, no." (See Exhibit P). Likewise, The Plaintiff inquired of Dr. Green "Are you aware of any investigation that your department conducted as to why the patient [Dr. Isaacs] was abandoned as a patient and why his actigraph watch disappeared or malfunctioned?" He responded "No." (Exhibit Q).

## NH BOARD OF MEDICINE

108.     The New Hampshire Board of Medicine (hereinafter "Board") granted Dr. Isaacs a Resident Training license pursuant to N.H. Admin. Rules Med 305.04 in May of 2011.

109.     In March of 2012 the Board commenced an investigation at Dartmouth Hitchcock Medical Center's request in to claims of professional misconduct.

110.     Dr. Isaacs received notice of a hearing to be held on February 5, 2014 at 1:00 pm.

111.     On January 29, 2014 the plaintiff notified the Board that he had filed suit against them in Pennsylvania and requested that the hearing be postponed. The Plaintiff further requested that he be allowed to appear at the hearing telephonically because of medical reasons. (See Exhibit R).

112.     The Board denied the request for postponement, reasoning that the litigation was not a proper reason to stay the case.   The Board also stated that Dr. Isaacs had not provided details of his medical issues and further would not allow him to appear by telephone or video conference.   Dr. Isaacs received notification of the Board's actions a little over a day before the hearing was to be held.

113.     On February 5, 2014 Dr Isaacs emailed  the board as follows:

> NH Board of Medicine:
>
> Due to the inclement weather between myself and New Hampshire, including snow, sleet and dangerous driving conditions around Boston and New York, I am not able to attend today's scheduled hearing. I currently have a rental car as my car is in the shop, and this car is particularly unequipped to drive in poor weather.
>
> Thank you for your understanding.

114.     The Board ignored that email and held a hearing without Dr. Isaacs in attendance. As such, Dr. Isaacs could not present evidence to the Board.

115.     Dr. Isaacs was unable to attend the hearing or present evidence.

116.     At the hearing, Dr. Finn, the director of Dr. Isaacs' residency program, provided sealed records of Dr. Isaacs's Keck enrollment to the Board.  Those records were sealed pursuant to a court-approved settlement agreement.  The Board never directly obtained the Keck academic records from Keck.

117.     The Board's investigator apparently obtained these records from PACER.  It was wholly improper for Dr. Finn to provide these records to the Board in the absence of any explanation as to the reason they were sealed or any related circumstances.

118.     The Board entered an order without Dr. Isaacs' input, presence, or defense, based on misapplication of the facts and a misuse and withholding of the evidence. Specifically,

the Board withheld the fact that Keck had settled a lawsuit with Dr. Isaacs, with the main consideration flowing to Dr. Isaacs being the sealing of contested disciplinary records.

119. Dr. Isaacs entered into two settlement agreements with Keck, one for dismissal of his action against its Deans, and another, dismissal against Keck as an institution. The Institutional Settlement is available on PACER, but the settlement with the deans was not online at the time.

120. The Institutional Settlement ordered Dr. Isaacs not to disclose his enrollment at Keck to others, and further, ordered Keck to cancel "all Administrative Charges," including Isaacs' expulsion from Keck.

121. Dr. Isaacs had emailed the Institutional Settlement to the Board's counsel, Assistant Attorney General Cahill, months before the hearing. Attorney Cahill failed to provide the agreement to the Board or its investigator.

122. The Board decision specifically denies the existence of any provision of the Keck settlement sealing Isaacs disciplinary records. That is incorrect, and Attorney Cahill possessed the settlement document that sealed the records but failed to give it to the Board.

123. The Plaintiff's medical license has already lapsed by mere fact he was no longer employed at Dartmouth. As such, the Board issued a severe reprimand which damaged Dr. Isaacs career and reputation. The Board further failed to serve the final Order and Plaintiff did not receive the order by mail or email. Instead, Plaintiff found out about the Board's decision online, well after the date was up to appeal the case.

124.     To this day how Dr. Finn acquired these sealed records has not been determined. She indicated that she found these records through her Attorneys but how and why they received them has never been explained.

125.     What is known is that Dr. Finn did not acquire these records through the normal channels.

126.     As a college administrator, Dr. Finn had a right to obtain Dr. Isaacs records through a FERPA transcript request to Keck.

127.     Had Dr. Finn made that request she would have received the highly unusual notice that those records had been sealed.

**DR. ISAACS' CONTINUED EFFORTS TO PRACTICE MEDICINE**

128.     Dr. Isaacs is endlessly damaged by Hitchcock's termination and the Board decision.  Dr. Isaacs applied to Dartmouth for another residency position in 2013, 2014, 2015, and 2016.  He never obtained an interview.  Dr. Isaacs also applied to numerous other medical programs, and similarly did not receive any interviews.

129.     Dr. Isaacs remains highly qualified for consideration as a resident.  His board scores, clerkship reviews, and educational honors remain in the upper strata of Hitchcock residents.

130.     Nevertheless, because the Board's erroneous decision is easily searchable and because he must disclose the Board's decision on every medical program application, there is not a medical program in the country that will take him on as a resident.

131.     Moreover, Dr. Isaacs still suffers from serious medical symptoms that date back to his first week with Dr. Khagi.  Dr. Isaacs has been largely isolated and reclusive from

the outside world for five years as a result of Defendants' actions, the harm to his health, and the harm to his reputation.

132.     In contrast to the past five years, Isaacs was previously an engaged and social individual at Dartmouth undergrad, Wharton MBA, and four years of medical school.

133.     The Plaintiff has found financial success through an online business but still holds the dream of practicing medicine and being able to use his education in medical research.

134.     Being a practicing doctor has been the Plaintiff's lifelong dream, he has the education and intelligence to do so, but has been unjustly restricted by the illegal actions and failures of the Defendants to give him a fair hearing before removing his right to pursue his chosen profession.

### V.  CAUSES OF ACTION

### COUNT I

### VIOLATIONS OF 42 U.S.C. § 1983

New Hampshire Board of Medicine

135.     Plaintiff repeats and re-alleges each and every allegation contained herein as if fully stated under this count.

136.     The right to practice an occupation is a liberty interest protected by the 14th Amendment of the United States Constitution. Gibson v. Berryhill, 411 US 564 (1973).

137.     The Board's Final Decision and Order regarding Dr. Isaacs, issued on March 11, 2014, misrepresents a settlement agreement found online as the settlement agreement referenced by Dr. Isaacs as the reason for not disclosing his attendance at Keck Medical School on the New Hampshire Application for Residency Training.

138.     Dr. Isaacs had presented the correct settlement agreement – the one that sealed the disciplinary records – to Attorney Cahill months before the hearing.  Attorney Cahill

failed to provide this settlement document to the Board, and the Board failed to consider it.

139.     This settlement agreement, approved by the USDC of California, is in effect a Federal Court Order. The operative provision sealing the records, constitute the justification for Dr. Isaacs' not identifying his attendance at Keck in the residency document.

140.     Because Dr. Isaacs did not appear at the Board hearing, and was not permitted to appear by telephone or video conference, he was unable to present contradictory evidence to the Board.

141.     The Board justified its reprimand on the only settlement agreement it had – the wrong one (illegally obtained in contravention of a settlement agreement approved by the Court) - and branded him a "stalker" on their website. [2]

142.     The Board's actions have precluded Dr. Isaacs from the practice of medicine.  By depriving Dr. Isaacs of his liberty interest in pursuing his chosen profession, specifically by withholding exonerating evidence, the Board violated 42 U.S.C. § 1983.

---

[2] Isaacs and a Keck classmate had a dispute, resulting in Keck issuing a "stay-away" order. Isaacs complied with the order, despite his allegations it was difficult to comply in a tight-knit class of one hundred students. After two months, Isaacs telephoned the other student and apologized, hoping to end the conflict. Keck thereafter convened its faculty and expelled Isaacs for disobeying the stay-away order. Isaacs alleged in the Central California District Court that favoritism played a role; email evidence showed the Keck Dean emailing the student's father at the NIH headquarters; an office where he had issued $20 million in federal grants to the Keck Dean prior to the other student's admission to Keck.

**COUNT II**
**FIFTH AMENDMENT DUE PROCESS VIOLATIONS**
All Defendants

143.     Plaintiff repeats and re-alleges each and every allegation contained herein as if fully stated under this count.

144.     The Fifth Amendment to the United States Constitution, along with the Fourteenth Amendment, guarantees certain due process rights.

145.     As described in further detail herein, there is extensive Government involvement in the training of medical interns that is sufficient for this Court to consider Dartmouth's actions State Action.  The NH Board of Medicine, is unequivocally a State Actor.

146.     Defendant's use of The California Federal District Court, Central District's order to determine what occurred at Keck is out of context and fails to consider the circumstances surrounding that order.

147.     Defendants were not a party to the California lawsuit in 2005, and have no privity to its rulings and determinations; it is improper for them to rely on out-of-context facts from a narrow order in a lawsuit where they were not a party.

148.     The use of this order to replace testimony or certified facts regarding these events is not only extremely problematic, but also a violation of due process at its fundamental core. Had these contentions not been contested then there would be no settlement agreement sealing the Plaintiff's Keck records. The Federal Court in that matter reviewed and approved the settlement Agreements, thereby making them Federal Court Orders. When Dartmouth presented this as "evidence" and the Board based its decision on such contested and dubious facts and issues, they not only violated a Court Order, but also breached the contract and thereby deprived Dr. Isaacs of the very benefit of his bargain in

settling that lawsuit. Namely, that it would not come back to bite him and forever be an erroneous bar to the practice of medicine into perpetuity. Indeed, the main benefit derived by Dr. Isaacs in agreeing to settle that lawsuit, namely confidentiality, was voided and vitiated in contravention of a Federal Court Order. This is an egregious violation of plaintiff's rights which he seeks redress from this Court .

149.    This treatment is very much akin to an indivudal being lifetime blacklisted for a previous lawsuit. This is, by its very definition, oppositional to the due process rights guaranteed by the Fifth and Fourteenth Amendments.

150.    Thus, Plaintiff has been deprived of a protected liberty interest- mainly the pursuit of happiness, the pursuit of prosperity, the right to make a living and to engage in one's chosen vocation, all to his very serious financial and personal detriment and all as the proximate result of the Defendants actions as outlined herein.

## COUNT III
## VIOLATIONS OF 42 U.S.C. s 1983
Dartmouth & Hitchcock

151.    Plaintiff repeats and realleges each and every allegation contained herein as if fully stated within this count.

152.    42 USC 1983 provides civil liability for violations of constitutional rights.

153.    The right to practice an occupation is a liberty interest protected by the 14th Amendment of the United States Constitution. Gibson v. Berryhill, 411 US 564 (1973).

154.    In Bricker v. Sceva Speare Memorial Hospital, 339 F. Supp. 234 (D. NH) this court found that federal funding of otherwise private hospitals is sufficient to clothe the activities of the hospitals with state action. Dartmouth, given its receipt of government funds should be considered a government actor.

155.     Here, the Defendant Dartmouth received government funds in order to train the Plaintiff.

156.     The Defendant Dartmouth receives government funds for each intern, these funds were not returned upon the Plaintiff's termination.

157.     There is extensive Government involvement in the training of medical interns that is sufficient for this Court to consider Dartmouth's actions State Action.

158.     The Plaintiff was never granted a hearing at Dartmouth upon his termination.

159.     Here, the Plaintiff was training to become a doctor, as more clearly set forth in this document termination from a training program is devastating to a young doctors' career.

160.     On April 20, 2014 the Plaintiff emailed the President of Dartmouth College to request an investigation regarding the hazing that the Plaintiff.

161.      No reply was ever given to this request.

162.     No investigation or hearing has ever occurred despite the Plaintiff's numerous requests.

163.     As a result of the Defendant's failure to investigate the Plaintiff remains unable to practice medicine in any form.

164.     The Defendant was well aware of the consequences of the Plaintiff's termination, and still proceeded to terminate him without hearing.

165.     The Plaintiff's ability to pursue a career in medicine is a right protected under the due process clause and the Defendant's infringement of that right without due process gives rise to liability under 42 U.S.C. 1983.

166.     The Plaintiff requested a fair hearing upon his termination from Dartmouth.

167.     Numerous employees and agents of Dartmouth confirm that no investigation or fair hearing was ever held to discuss the Plaintiffs termination.

168.     The Defendants due process failures directly and reasonably foreseeably resulted in the February 2014 order from the New Hampshire Board of Medicine, where the Plaintiff's medical license was revoked by the Board.

**COUNT IV**
**VIOLATIONS OF 42 USC 1985(3)**
All Defendants

169.     Plaintiff repeats and realleges each and every allegation contained herein as if fully stated within this count.

170.     The Board of Medicine, a State Actor, refused to investigate Isaacs' claims against Dartmouth, Bertrand, Jim Yong Kim, and Khagi – all physicians licensed in New Hampshire.

171.     42 USC 1985(3) provides civil liability for "two or more persons in any State or Territory [who] conspire... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or for equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory for giving or securing to all persons within such State or Territory the equal protection of the laws..."

172.     The parties here have conspired here for the purpose of preventing or hindering the constituted authorities of the state from giving the Plaintiff equal protection of the laws.

173.     As more completely stated above the Defendants conspired in their failures to allow the Plaintiff to present evidence or testimony and in their failure to properly investigate the Plaintiff's claims.

174.     These failures resulted in the Plaintiff being denied equal protection of law.

175.     As a result of these failures both Dartmouth and the New Hampshire Board of Medicine made decisions that resulted in the current inability of the Plaintiff to practice medicine.

176.     Through this conspiracy the Plaintiff has been denied his right to equal protection of law.

## COUNT V
## VIOLATIONS OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972
Dartmouth Trustees and Hitchcock

177.     Plaintiff repeats and realleges each and every allegation contained herein as if fully stated within this count.

178.     On Sunday April 20, 2014 at 12:52 am Dr. Isaacs sent a written request to President Philip Hanlon which requested an investigation in to the hazing and other violations of title IX that Dr. Isaacs suffered while he was an intern at Dartmouth. (See Exhibit C).

179.     On the Plaintiff's second day of work it was requested that he do a DRE prostate examination on a patient with terminal metastatic cancer.

180.     He was required to do a second DRE examination on another patient shortly thereafter.

181.     Dr. Isaacs, following the orders of his superior performed these prostate exams.

182.     Dr. Isaacs later learned that no medical necessity existed for those exams.

183.     Knowing that these examinations were unnecessary, Dr. Isaacs suffered knowing that he had been ordered to take part in the indecent assault of a patient.

184.     Dr. Isaacs for the first time suffered from an onset of medical symptoms including heart issues, nightmares, sleep disturbances and an inability to stay awake for extended periods of time.

185.     When asked about these assaults in deposition Dr. Khagi described these assaults as "an opportunity to learn twice." (See Exhibit B).

186.     Dr. Isaacs requested that Dartmouth investigate this incident. No investigation ever occurred.

187.     Title IX provides: "No person... shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal Financial assistance." 20 U.S.C. s. 1681(a).

188.     The Supreme Court has found an implied private right of action for individuals to enforce the mandates of Title IX. Cannon v. Univ. of Chi., 441 U.S. 677, 717 (1979).

189.     It has also been held that private individuals can obtain monetary damages. Franklin v. Gwinnett County Pub. School., 503 U.S. 60, 76 (1992).

190.     The Defendant Dartmouth is a title IX funding recipient.

191.     The Plaintiff Jeffrey Isaacs informed Dartmouth that he had been the victim of a sexual assault because Dr. Kahgi had him perform two prostate exams under false pretenses.

192.     Dartmouth has failed to investigate the Plaintiffs complaints as indicated by a variety of Dartmouth employees and witnesses.

193.     Upon information and belief such complaints by a female at Dartmouth would have been treated much more seriously.

194.     The allegations of the Plaintiff have been largely ignored because of his status as a male in violation of Title IX.

195.     Here the Plaintiff has given Dartmouth actual knowledge of the discrimination through a number of complaints.

196.     Dartmouth has failed to address the discrimination and has acted with deliberate indifference to these allegations.

197.     The damage caused to the Plaintiff because of this violation is substantial. Had these investigations occurred he may have been able to complete the internship program.

<u>**COUNT VI**</u>
<u>**AMERICANS WITH DISABILITIES ACT (AND RETALIATION)**</u>
NH BOARD OF MEDICINE

198.     Plaintiff repeats and realleges each and every allegation contained herein as if fully stated under this count.

199.     The Board's actions to require a disabled individual to drive through 8" of snow from Philadelphia constituted violation of the ADA.

200.     Videoconferencing appearance was a reasonable accommodation that would have ensured Plaintiff could present exonerating evidence. The Board denied this reasonable accommodation and hence further obstructed Plaintiff's ability to present exonerating evidence.

201.     Moreover, the Boards failure to include evidence the Plaintiff had emailed prior to the hearing, and the Boards failure to timely notify Plaintiff of the adverse ruling against him constitute ADA retaliation under statute and established case law.

## COUNT VII
## ADA and Title IX Retaliation
DARTMOUTH TRUSTEES AND HITCHCOCK

202.    Plaintiff repeats and realleges each and every allegation contained herein as if fully stated under this count.

203.    Isaacs applied for federal residency at DHMC in 2013, 2014, 2015, and 2016.

204.    Isaacs was, as discussed, qualified or above-qualified.

205.    Dartmouth refused to even interview Isaacs, solely because he had brought claims, including ADA, against their program.

206.    As such, Dartmouth actively rejected Isaacs' applications on multiple occasions between 2013 and 2017.

207.    Dartmouth's own Friedman has testified under oath that Isaacs' medical knowledge was adequate for DHMC.

208.    Dartmouth's own Finn had testified under oath that she would retract her objection to the Keck sealed disciplinary records, per competent authority at AAMC.

209.    Dartmouth's own Finn had testified under oath that Isaacs alleged performance problems in 2011 did not constitute sufficient cause to end his residency training.

210.    As such, the only explanation for Dartmouth's failure to interview is because they didn't want to interview someone who had filed ADA and/or Title IX claims.\, and a refusal to acknowledge a federal court ordered settlement agreement

## COUNT VIII
## INJUNCTIVE RELIEF
ALL DEFENDANTS

211.    Plaintiff repeats and realleges each and every allegation contained herein as if fully stated under this count.

212.    Here the monetary relief sought will not be enough to make the Plaintiff whole.

213.    The Defendant New Hampshire Board of Medicine, in violation of a Federal Court order has published sealed records and falsehoods regarding Plaintiffs' time at Keck.

214.    As long as the board's decision remains published and accessible the Plaintiff is unable to pursue the practice of medicine.

215.    The Plaintiff is likely to succeed on the merits of his claims against the New Hampshire Board of Medicine.

216.    Given the Plaintiff's claims for the violations of the Due Process clause it would be inappropriate for this decision to remain published.

217.    Dartmouth's termination likewise relied upon multiple due process violations, destruction of evidence, fraudulent statements to the Court of automatic processes, and a refusal to acknowledge a federal court ordered settlement agreement.

218.    Finn, in a deposition, promised she would accept the AAMC investigation results.

219.    The AAMC determined Isaacs' sealed Keck records needed not be disclosed on his residency applications.

220.    Despite Finn's promise in January 2014 to accept the AAMC determination and retract Isaacs' termination, no retraction ever took place.

221.     Plaintiff reasonably expected a retraction or revision of his termination letter no later than February 5, 2014.

222.     The monetary damages will serve to make the Plaintiff whole for his inability to practice medicine in the past, injunctive relief is necessary to ensure that the Plaintiff is not further impeded by these decisions that resulted from the defendants' due process failures.

## CONCLUSION

223.     Dr. Isaacs had achieved quite well as a medical student and deserved a fair chance at residency. All indicators before, and after, Dartmouth Psychiatry indicate Dr. Isaacs had potential to benefit the medical profession. Rather than be allowed to do his work, his supervisors at Dartmouth repeatedly subjected him to improper treatment.

224.     Isaacs has done nothing than persist, twelve years now, in his extraordinary quest to contribute to the medical profession. He reasonably believes that by denying him his right to work in medicine, his potentially substantial contributions to the field have been lost. This Honorable Court is called upon to allow this motivated physician and scientist the opportunity to rightfully go back to work by Ordering the removal of defamatory, confidential and erroneous information posted by the NH Board of medicine in contravention of a Federal Court's approved settlement agreement.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Honorable Court:

A.  Enter judgment in favor of Jeffrey Isaacs on Counts I - VII, and award

damages, costs. and reasonable attorneys' fees.

B.  Enter judgment in favor of Jeffrey Isaacs on Count VIII, and enter injunctive

relief

    i.   precluding the continued publication of the Board's Final Decision and

       Order and

    ii.  retracting Dr. Isaacs' termination from Hitchcock.

C.  Grant such other relief as the Court deems just and proper.

PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.

February 3, 2017

Respectfully Submitted,
Dr. Jeffrey Isaacs,
By and through his counsel

/s/ Keith A. Mathews
Keith A. Mathews, Esq.
NH Bar No. 20997
587 Union Street
Manchester, NH 03104
(603) 622-8100
(888) 912-1497 fax
Keith@aaone.law